UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

| | |
|---|---|
| THE ESTATE OF JACOB ALLEN JONES, by and through its Personal Representative, Catherine Jones<br><br>PLAINTIFF,<br><br>v.<br><br>CRAWFORD COUNTY, ARKANSAS; JARED ENTREKIN; CESAR GALDAMEZ; MATTHEW NOWICKI; JAMES OKONIEWSKI; EDITH ESPINOZA; KRISTEN FOSS; NICHOLAS HICKS; and JANE DOE 1<br><br>DEFENDANTS. | No.   2:23-cv-02112-PKH<br><br>(JURY DEMAND) |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**I. INTRODUCTION**

1. On October 14, 2022, Jacob Allen Jones was involved in a routine traffic stop along with his uncle, David Conrad Alverson Sr. Both parties were then arrested and placed into the Crawford County officer's police vehicle around 5:00 PM for a routine traffic stop. The arresting officer made no valid attempts to search either person for contraband. While sitting in the back of the police vehicle and waiting to be transported to Crawford County Detention Center ("**Crawford County Jail**"), Mr. Jones ingested a small baggie that his uncle had on his person. It is likely that the baggie in question contained methamphetamine.

2. Once the two men arrived at the Crawford County Jail, they went through booking and were placed in a housing section of the jail (hereinafter referred to as "F Pod.") On or about the time that Mr. Jones arrived in the pod from 12:00 AM until his death the next

morning, Mr. Jones began exhibiting clear symptoms of a lethal overdose reaction. Mr. Jones would sweat, shake, and then would lay on the ground underneath the stairs in F Pod for hours with **no** medical attention given by Crawford County Jail staff.

3. Specifically, on October 15, 2022, at or around 12:00 PM, Jacob was in serious need of medical attention after having trouble and potentially seizing for a few hours. A group of deputies finally went to check on Mr. Jones after being informed that Mr. Jones was unresponsive and could see him foaming at the mouth. He was found face down with a faint pulse and medical personal was called for three separate times. There was no response. Because of this, Mr. Jones had to be carried to the booking area of the jail where a nurse finally began performing first aid.

4. Mr. Jones was loaded into an ambulance and arrived at Baptist Health-Van Buren around 12:30 PM where further aid was rendered until Mr. Jones was pronounced dead at 1:09 PM.

5. During the hours of October 14, 2022, at 5pm to October 15, 2022, at 12 pm, Mr. Jones exhibited behavior that would indicate to a reasonable person that there were clear medical issues and that he needed medical assistance. This is evident in the fact that Mr. Jones tried to wave and get attention from deputies on duty multiple times without success. Additionally, several inmates approached different officers throughout the day, informing them that Mr. Jones desperately needed medical attention. However, no help would come until Mr. Jones had already passed away.

6. Mr. Jones was ignored by several different sets of deputies; despite the fact he was waiving his hands for attention on several occasions, and the pleas of other inmates who were constantly trying to get help for Mr. Jones were ignored. Mr. Jones' death was a direct result of negligence and/or direct indifference by Crawford County and their employees.

7. This federal suit is brought Mr. Jones' Court appointed Personal Representative,

Catherine Jones under 42 U.S.C. § 1983 to redress his constitutional rights that were violated before his death. Plaintiff also seeks to hold defendants liable for Mr. Jones pain, suffering and wrongful death. Plaintiff also seeks to address the loss, grief, and anguish suffered by his surviving heirs at law.

## II. JURISDICTION AND VENUE

8.      This Court has original subject matter jurisdiction over Plaintiff's civil rights claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a) because it arises from the same case or controversy as the claim giving the federal court original jurisdiction.

9.      Venue in this forum is proper under 28 U.S.C. § 1391(b)(2) as the events giving rise to Plaintiff's claims occurred entirely in this judicial district.

## III. PARTIES

10.     Plaintiff is the Estate of Jacob Allen Jones formed under Arkansas law and acting through its court appointed Personal Representative, Catherine Jones. Mr. Jones was a citizen of the United States and a resident of Van Buren, Arkansas when he died on October 15, 2022. Prior to his death, Mr. Jones had just been booked into jail and was not tried or convicted for the crime he allegedly committed. Because he was awaiting trial, Mr. Jones was entitled to the same constitutional protections afforded to all pre-trial detainees under the Fourteenth Amendment to the United States Constitution.

11.     Defendant Crawford County is a municipal corporation, organized under the laws of the State of Arkansas. Crawford County is a "person" for purposes of 42 U.S.C. § 1983. At all relevant times, the County operated the Crawford County Detention Center. Acting through the Crawford County Sheriff's Office, the County was responsible for the training and supervision of its employees; adopting and enforcing reasonable jail policies; and for ensuring that the people in its custody received necessary medical and mental health care, as required under the United

States Constitution, other laws, and its own policies. Crawford County is liable for any negligence by employees or unconstitutional policies or practices that resulted in harm to any person confined in the jail.

12. Defendant Cesar Galdamez is an employee at Crawford County Detention Center who, on information and belief, resides in Arkansas. At all times relevant to this suit, Defendant Galdamez was acting under the color of state law. Regardless of his residency if found to be in another state, the allegations against this defendant arise from his actions in Arkansas and in this judicial district.

13. Defendant Jared Entrekin is an employee at Crawford County Detention Center who resides in Arkansas. At all times relevant to this suit, Defendant Entrekin was acting under the color of state law. Regardless of his residency if found to be in another state, the allegations against this defendant arise from his actions in Arkansas and in this judicial district.

14. Defendant James Okoniewski is an employee at Crawford County Detention Center who resides in Arkansas. At all times relevant to this suit, Defendant Okoniewski was acting under the color of state law. Regardless of his residency if found to be in another state, the allegations against this defendant arise from his actions in Arkansas and in this judicial district.

15. Defendant Matthew Nowicki is an employee at Crawford County Detention Center who resides in Arkansas. At all times relating to this suit, Defendant Nowicki was acting under the color of state law. Regardless of his residency if found to be in another state, the allegations against this defendant arise from his actions in Arkansas and in this judicial district.

16. Defendant Edith Espinoza is an employee at Crawford County Detention Center who resides in Arkansas. At all times relevant to this suit, Defendant Espinoza was acting under the color of state law. Regardless of his residency if found to be in another state, the allegations against this defendant arise from her actions in Arkansas and in this judicial district.

17. Defendant Kristen Foss is an employee at Crawford County Detention Center

who, on information and belief, resides in Arkansas. At all times relevant to this suit, Defendant Espinoza was acting under the color of state law. Regardless of her residency if found to be in another state, the allegations against this defendant arise from his actions in Arkansas and in this judicial district.

18. Defendant Nicholas Hicks is an employee at Crawford County Detention Center who resides in Arkansas. At all times relative to this suit, Defendant Espinoza was acting under the color of state law. Regardless of his residency if found to be in another state, the allegations against this defendant arise from his actions in Arkansas and in this judicial district.

19. Defendant Jane Doe was, at all times relevant to this case, a part of medical staff at the Crawford County Detention Center and an employee of the Crawford County Detention Center. In their role, they were responsible for the health, safety, security, and welfare of all inmates in the jail, including Mr. Jones. Jane Doe, for the purposes of this suit, was acting under the color of statelaw. Jurisdiction is proper here because regardless of Doe's place of residence, the allegations against her arise from their conduct in this judicial district in Arkansas.

## IV. FACTS

20. On October 14, 2022, Jacob Allen Jones and David Conrad Alverson Sr. were stopped by Officer Joshua Aden. Officer Aden initiated the traffic stop based on the fact that the party's vehicle had a defective brake light. Given the party's criminal history Officer Aden placed both parties in the back of his squad car for the officers' safety. However, Officer Aden did not pat down or search Mr. Jones or Mr. Alverson before placing them both in custody. Officer Aden then conducted a search of the party's vehicle in question and found no illegal contraband.

21. Both men were left alone in the back of Officer Aden's vehicle for an extended period of time. During this period, the footage from Officer Aden's back seat camera depicts Mr.

Alverson convincing Mr. Jones to ingest a small plastic bag. Mr. Alverson also managed to ingest a small plastic bag.

22. Once Mr. Jones and Mr. Alverson arrived at the Crawford County Jail, they were booked into the jail then were transferred to F Pod in the Crawford County Jail. At this time the inmates have stated that they could tell something was wrong with Mr. Jones the minute he arrived in F Pod.

23. Throughout the night of October 14th and the morning of October 15th, Mr. Jones did not appear to be well as evidenced by Crawford County Jail camera surveillance of F Pod. Mr. Jones can be seen wandering throughout the pod at around 5:00 AM, clearly in pain and not doing well. He takes a shower in the early morning at or around 6:30 AM and can be seen standing in front of the mirror, visibly in distress. At or around the time of breakfast that morning, Mr. Jones began "sweating and having seizures" according to one inmate.

24. On the morning of October 15, 2022, Deputy James Okoniewski and Deputy Jared Entrekin were in charge of conducting breakfast "feeding." During breakfast, the above-mentioned deputies were instructed by their Sergeant to perform what is known as a "count." A proper count, according to Corporal Reed Ingram, requires all "inmates to line up on the wall . . . with their clothes on." This ensures all inmates are up, present in the pod, and moving around. While the Sergeant on shift said that a count occurred this morning, the two men did not perform an official count that morning.

25. Instead, both deputies on duty reported that they did the official "count" by counting the trays going into F Pod for breakfast instead of lining the inmates up one by one as they are supposed to do each morning. While they were counting the trays, both men noticed there was an extra tray at the door, meaning one inmate had not received a tray of food.

26. Upon further investigation, the deputies were informed that the inmate who did not receive a tray was Mr. Jones. They were told that Mr. Jones was lying underneath the stairs

in F Pod. Both deputies report Mr. Jones was "waving" at them and just assumed he was waving them off. They made no effort to go over to Mr. Jones to confirm his condition or offer any kind of aid. Deputy Okoniewski even admits in his report that he normally would go over to an inmate to check on them in this type of situation, but just did not check on Mr. Jones. If deputies had checked on Mr. Jones at this time, then it reasonably could have resulted in Mr. Jones getting the medical attention he needed.

27. Deputy Entrekin stated in a report that he usually makes sure "everyone is up, everybody's moving, and nobody is dead" when conducting "counts." Deputy Entrekin should have checked on Mr. Jones at this time, but he did not. Deputy Entrekin had to be reminded in an investigative report that it is "important that [he] goes and physically lays eyes on the inmates and physically check on them" when inmates refuse trays.

28. At or around 8:45 AM on October 15, 2022, Inmate Charles Robinson observed Mr. Jones laying down and shaking. At this point, Mr. Robinson hit the tower button and told the deputy in the tower at the time (Deputy Edith Espinoza) what he observed. Mr. Robinson stated that Mr. Jones needed immediate medical help. Mr. Robinson was informed that Deputy Espinoza would let another officer know, but Deputy Espinoza never followed up or relayed this information to another officer. Due to Deputy Espinoza, Mr. Jones never got the medical attention he needed at this point in time.

29. Based upon reasonable belief and facts available to the Plaintiff at the time of this filing, Deputy Matthew Nowicki performed "med pass" on the morning of October 15, 2022. Deputy Nowicki was approached by two different inmates, and they both told Deputy Nowicki that Mr. Jones needed to see the nurse immediately. Deputy Nowicki went over and directly observed that Mr. Jones did not look well, and he told Mr. Jones that he would see what he could do and that he would get the nurse when he got a chance.

30. Deputy Nowicki never got a nurse to assist Mr. Jones because the interaction he

7

had with Mr. Jones and another inmate "slipped his mind." Deputy Nowicki further stated that he could have gotten a nurse right away, but the nurses reprimand the deputies if they inform a nurse that an inmate needs to be seen. Nurses want inmates to put in "sick requests" instead of just checking on the inmates if they need help. In an incident report that resulted from Mr. Jones' death, Deputy Nowicki had to be reminded that the nurses work for Crawford County Detention Center. Further, it is the deputies' job to "make sure inmates are taken care of and healthy." Deputy Nowicki should have had the nurse look over Mr. Jones to ensure he was healthy, but he failed to do so.

31. Based upon reasonable belief and facts available to Plaintiff at the time of this filing, after breakfast had been served, Deputy Cesar Galdamez was conducting "pod checks." According to an inmate, Deputy Galdamez did not do a full walk-through of the pod like he was supposed to, but only "scanned at the door." While at the door, Inmate Robinson approached Deputy Galdamez and told Deputy Galdamez to go check on Mr. Jones because he was concerned something medical was wrong with Mr. Jones. Deputy Galdamez did not go over to check on Mr. Jones but instead only observed from the door of the pod area. Deputy Galdamez admits that he saw Mr. Jones make more "hand gestures" and that Mr. Jones was wrapped in blankets at this time that were soaked through with his sweat, and he was lying under the stairs of F Pod. Once again, these signs were ignored, and no medical attention was given to Mr. Jones.

32. Deputy Galdamez was later approached by another inmate who asked the deputy to put Mr. Jones on the medical intake list so he could get medical attention. Deputy Galdamez responded that he would see what he could do, but again took no further action. The inmate has stated that he never saw Galdamez again after this interaction.

33. Additionally, Deputy Galdamez was approached by David Alverson. Mr. Alverson asked Deputy Galdamez for extra blankets because Mr. Jones was wrapped in two of them and was having cold sweats and they were both "soaked through." Mr. Alverson states that

this request was denied. Again, no further action to check on Mr. Jones was taken by Deputy Galdamez.

34. When Deputy Galdamez was later asked what stopped him from simply going over to check on Mr. Jones, Deputy Galdamez said "nothing was stopping him" from checking on Mr. Jones. Further, he stated that "they could have done better" and that "he could have done better" in this situation.

35. Another "count" of the inmates in F Pod was supposed to be performed either before or during lunch, but this never occurred. Sergeant Tonya Luangsiyotha said she "knew that she should have had her deputies count." However, the on-shift supervisor said it would be okay if a proper "count" was done that morning, but a proper "count" was not performed that morning or at lunch.

36. At or around 12:00 PM, lunch was being served in F Pod and Deputy Kristen Foss and Deputy Espinoza oversaw "lunch feeding." Deputy Espinoza oversaw filling and passing out drinks and Deputy Foss oversaw the handing out of the trays.

37. During lunch, Deputy Espinoza was informed by an inmate that Jacob was laying on the floor and did not look good at all. Deputy Espinoza then stated that she would check on Mr. Jones once she was done passing out drinks. Also, Deputy Espinoza already knew that Mr. Jones needed help due to the tower call she had received earlier that day. However, again, Deputy Espinoza did not go and check on Mr. Jones, even after being reminded again that Mr. Jones needed help.

38. During this same time at lunch, the lunch trays were being handed out by Deputy Foss. At this time, Mr. Jones was still in need of medical attention and Plaintiff has reason to believe his condition had deteriorated significantly at this point. Mr. Jones' uncle, David Alverson Sr. approached Deputy Foss and he asked her to go check on Mr. Jones. Deputy Foss simply responded, "no", and Mr. Alverson then asked several times for Mr. Jones tray so that he

could take it to him. Finally, Deputy Foss gave Mr. Alverson an extra tray for Mr. Jones while ignoring the requests to go help Mr. Jones.

39. After this interaction, Mr. Alverson returned to Mr. Jones and attempted to wake him up to give him his tray. There was no response. After seeing this, Mr. Alverson returned to Deputy Foss and attempted to tell her about Mr. Jones condition but that was ignored when she stated that Mr. Jones had "already gotten a tray." Mr. Alverson informed Deputy Foss that he was not there to get another tray and informed her that Mr. Jones had stopped breathing. Deputy Foss then radioed Deputy Galdamez and Deputy Nicholas Hicks saying they needed to "check something out" in F Pod and waited for the other Deputies to arrive.

40. At some point at or around 12:03 PM, the men in F Pod were still lining up to get their trays for lunch, and Inmate Archer states that at this time Mr. Jones started foaming at the mouth.

41. Once Deputies Hicks and Galdamez arrived on scene, Deputies Foss, Galdamez, and Hicks approached Mr. Jones. Mr. Jones was lying face down on his stomach. Deputy Foss states that they turned him over onto his back and they all noticed he was pale and purple and that his arms were tucked into his side.

42. Deputy Hicks stated that he then felt for a pulse on Mr. Jones and noticed that it was faint. Deputy Hicks then performed a sternum rub which Mr. Jones did not respond to. After this, Deputy Hicks felt for a pulse again and did not feel one.

43. After Deputy Hicks realized Mr. Jones no longer had a pulse, he began radioing for immediate medical attention in F Pod. Deputy Hicks called over the radio three times and received no response.

44. At or around this time, Deputy Espinoza realized Deputy Hicks was not getting a response from the medical staff and ran to find the nurse. Deputy Espinoza met up with the nurse somewhere around A Pod, and camera footage shows this nurse, known only to Plaintiff at this

time as Jane Doe, getting supplies out of a cabinet around the time the frantic radio calls were being made. The footage shows the nurse slowly grabbing supplies from a cabinet and not rushing to aid Mr. Jones in any way.

45. After hearing no response from medical personnel, Deputy Galdamez stated that they needed to do something. Deputy Galdamez picked up Mr. Jones in his arms and began sprinting towards the booking area of the jail. As they were running out of F Pod, many of the inmates were yelling that "they told Galdamez" earlier something was wrong with Mr. Jones. One inmate even stated that the reason they decided to run with him to booking was because "it looked like he had already passed."

46. Once the deputies arrived with Mr. Jones in the booking area, Jane Doe was there and began first aid on Mr. Jones. This continued until EMS arrived on the scene.

47. Deputy Matthew Hesson was dispatched to the Crawford County Jail in response to Mr. Jones becoming unresponsive. When Deputy Hesson arrived, EMS was on scene and Jane Doe was still doing chest compressions. Deputy Hesson then rode in the ambulance with Mr. Jones to Van Buren Baptist Hospital.

48. When Mr. Jones arrived at the hospital, life-saving measures were attempted for around 30 minutes before Mr. Jones was pronounced dead. Deputy Hesson took pictures of the body. In these photos Mr. Jones is observed to be very pale, his fingers and toes were purple.

49. An autopsy later conducted revealed that Jacob jones had died from methamphetamine toxicity.

A. **Additional Facts Pertaining to Crawford County's Liability**

50. The unconstitutional treatment and negligent acts/omissions alleged in this complaint were carried out in accordance with the official policies, customs, and practices of Crawford County.

51. Defendant Crawford County violated Mr. Jones Eight Amendment constitutional rights as applied through the Fourteenth Amendment. Crawford County and its employees

displayed deliberate indifference to his safety and well-being in violation of the Eighth Amendment. Acts that show a deliberate indifference to Mr. Jones well-being include failing to properly search Mr. Jones and Alverson before they were placed into a police car, failing to get Mr. Jones medical treatment after being asked several times to care for him, and failing to perform inmate counts that met Crawford County's own standards. These policies, customs, and practices directly contribute to Mr. Jones' death since earlier medical attention could have saved his life. Ultimately, these practices resulted in Mr. Jones' pain, suffering and death. Mr. Jones' death also resulted in mental anguish for his surviving mother and siblings.

52. Further, Defendant Crawford County failed to reasonably train and supervise its staff to ensure they followed procedures such as walking through pods to check on inmates and making sure they are performing counts correctly. This also includes failing to train and supervise staff on howto realize when people need immediate medical attention and how to respond when an inmate needs immediate assistance.

53. All acts and omissions committed by Defendant Crawford County were committed with intent, malice, and/or with deliberate indifference towards Mr. Jones' life and his constitutional rights. These defendants knew or should have known that the actions or omissions of their deputies would likely result in serious injury or death.

54. Defendant Crawford County and their employees/agents had a duty to care for Mr. Jones under the applicable reasonable standards of medical and correctional care. Defendant Crawford County breached that duty. This foreseeably resulted in Mr. Jones mental anguish, pain, and ultimately death as well his family's pain and suffering.

## V. CAUSES OF ACTION

**A. Violations of Plaintiff's Constitutional Rights under 42 U.S.C § 1983**

55. Based on the allegations in this complaint, all defendants are liable under 42 U.S.C. § 1983 for violating Mr. Jones' civil rights under the Eighth Amendment as applied through the

Fourteenth Amendment. This includes depriving Mr. Jones of his right to necessary, potentially life-saving medical care, which resulted in his pain, suffering, and death during his detention at the Crawford CountyDetention Center, owned and operated by Crawford County. Crawford County Detention Center also violated Mr. Jones right to be protected from cruel and unusual punishment. The named deputies and Crawford County showed a reckless indifference to the risk of Mr. Jones dying by refusing to get him medical help after multiple requests in violation of his Eight Amendment Rights as applied through the Fourteenth Amendment.

56.  The alleged Fourteenth Amendment violations also caused Mr. Jones' surviving mother and siblings to suffer ongoing mental anguish and grief. It also shattered the family relationship and broke the familial bonds between Mr. Jones and his family.

**B.    Arkansas Wrongful Death & Survival Statute: Negligence**

57.  As a result of the conduct alleged in this complaint, Defendants Crawford County, Cesar Galdamez, Jared Entrekin, James Okoniewski, Matthew Nowicki, Edith Espinoza, Kristen Foss, Nicholas Hicks, and Jane Doe are liable for proximatelycausing Mr. Jones' pain, suffering and death by failing to follow the accepted standards of care owed to Mr. Jones. Further, by not rendering proper or timely aid, Defendants breached their duty, causing pain, suffering, and Mr. Jones wrongful death. Defendant Crawford County is liable for the negligent acts and omissions of its agents and employees as a matter of law. These claims, actionable through Mr. Jones' surviving beneficiaries and his These claims are actionable through Mr. Jones' estate. They are ascertained for the benefit of Mr. Jones and his surviving mother and siblings under Arkansas' wrongful death and survival statutes. Ark. Code Ann. §16-62-101, *et seq.*

**C.    Arkansas Wrongful Death & Survival Statutes: Violation of Correctional Standards**

58.  Based on the allegations set forth in the complaint, the individual county corrections officer-defendant, listed above as parties are liable for violating their applicable correctional standards of care and negligently causing the death and pre-death pain and suffering of Jacob

13

Jones, and Crawford County is liable for these violations. These claims are actionable through Mr. Jones' estate. They are ascertained for the benefit of Mr. Jones and his surviving mother and siblings under Arkansas wrongful death and survival laws. Ark. Code Ann. §16-62-101, *et seq*.

## VI. JURY DEMAND

59. Plaintiff demands a trial by jury.

## VII. REQUEST FOR RELIEF

60. Plaintiff asks the Court to award the following relief:

    A. Requests judgement against Defendant Entrekin in his individual capacity.

    B. Requests judgement against Defendant Entrekin in his official capacity as an employee of Crawford County, Arkansas.

    C. Requests judgement against Defendant Galdamez in his individual capacity.

    D. Requests judgement against Defendant Galdamez in his official capacity as an employee of Crawford County, Arkansas.

    E. Requests judgement against Defendant Nowicki in his individual capacity.

    F. Requests judgement against Defendant Nowicki in his official capacity as an employee of Crawford County, Arkansas.

    G. Requests judgement against Defendant Okoniewski in his individual capacity.

    H. Requests judgement against Defendant Okoniewski in his official capacity as an employee of Crawford County, Arkansas.

    I. Requests judgement against Defendant Espinoza in her individual capacity.

    J. Requests judgement against Defendant Espinoza in her official capacity as an employee of Crawford County, Arkansas.

    K. Requests judgement against Defendant Foss in her individual capacity.

    L. Requests judgement against Defendant Foss in her official capacity as an employee of Crawford County, Arkansas.

M. Requests judgement against Defendant Hicks in his individual capacity.

N. Requests judgement against Defendant Hicks in his official capacity as an employee of Crawford County, Arkansas.

O. Requests judgement against Defendant Jane Doe in her individual capacity.

P. Requests judgement against Defendant Jane Doe in her official capacity as an employee of Crawford County, Arkansas.

Q. Requests judgement against the County of Crawford, Arkansas, and the Crawford County Jail.

R. The policies, practices, procedures, and customs established by the Crawford County Jail and the County of Crawford, Arkansas that led to the violations of Plaintiff's rights protected under the Constitution of the United States, 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

S. Requests compensatory and punitive damages against all listed Defendants. The amount of said judgment shall exceed that required for federal jurisdiction, the specific amount of which will be more particularly proved at trial.

T. Plaintiff hereby requests attorney's fees and costs.

U. Plaintiff hereby requests that they be awarded any and all medical bills and lost wages.

V. Plaintiff hereby requests that they be awarded pre-judgment interest on its judgment.

W. Plaintiff hereby requests that such other and further relief as the Court may deem equitable, proper, and just, be granted.

Respectfully Submitted,

By: /s/ Adam H. Rose
Adam H. Rose, ABA#2020194
Powell & Rose Law Firm, PLLC
541 N Greenwood Ave,

Fort Smith, AR 72901  
(479) 222-6773 Telephone  
(469) 769-2273 Facsimile  
adam.dpowellfirm@gmail.com  
*Attorney for Plaintiff*

**By:   /s/ David L. Powell**  
David L. Powell, ABA#2011256  
Powell & Rose Law Firm, PLLC  
541 N Greenwood Ave,  
Fort Smith, AR 72901  
(479) 222-6773 Telephone  
(469) 769-2273 Facsimile  
dpowellfirm@gmail.com  
*Attorney for Plaintiff*
